UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
MARIO LOPEZ,

                        Plaintiff,

          — against —                  **MEMORANDUM & ORDER**

COMMISSIONER OF SOCIAL SECURITY,        10-CV-4885 (SLT)

                       Defendant.
--------------------------------------------------------X

**TOWNES, United States District Judge:**

       Plaintiff Mario Lopez ("Plaintiff" or "Lopez") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act seeking reversal of the final decision of the Commissioner of Social Security denying Social Security benefits.  Defendant, the Commissioner of Social Security ("Defendant" or "Commissioner"), moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Plaintiff cross-moves for judgment on the pleadings or, alternatively, remand.  For the reasons detailed below, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff's motion is denied.  The final decision of the Commissioner is affirmed and Plaintiff's Complaint is dismissed.

**I.      BACKGROUND**

     **A.    Procedural History**

       On May 21, 2007, Plaintiff filed an application for supplemental security income and disability insurance benefits.  (Tr. 55, 93.)[1]  He alleged disability beginning November 1, 2006 due to "kidney problems, tumors, cancer, diabet[e]s, [and] high blood pressure."  (Tr. 110.)  After his applications were denied, Plaintiff requested a hearing.  (Tr. 57-62, 63.)  On June 24, 2008, Plaintiff appeared before Administrative Law Judge ("ALJ") Harold Rosenbaum with a non-attorney representative and a Spanish interpreter.  (Tr. 24-54.)  On July 11, 2008, ALJ

---

[1] Citations to the administrative record are in the form "Tr.".

Rosenbaum issued a decision denying benefits.  (Tr. 10-23.)  Plaintiff requested review by the Appeals Council and submitted additional evidence.  (Tr. 4, 5, 630-33.)  The Appeals Council made this additional evidence part of the record.  (Tr. 4.)  However, they found no reason to review the ALJ's decision.  (Tr. 1-2.)  After the Appeals Council denied Plaintiff's request for review on August 31, 2010, the ALJ's decision became final and Plaintiff filed suit in this Court.

### B.      Factual & Medical Background

Plaintiff was born on May 26, 1954 and is a naturalized citizen of the United States.  (Tr. 87.)  The record indicates that Plaintiff either completed ninth grade or four years of high school in Ecuador.  (*Compare* Tr. 30 *with* Tr. 115.)  Plaintiff can speak and read some English, but understands better in Spanish.  (Tr. 27-28.)  From 1970 to 2006 he worked as a carpenter making cabinets.  (Tr. 30, 111.)  According to Plaintiff, the position required him to walk or stand 7 hours out of the day and sit one hour.  (Tr. 111.)  He had to handle, grab, or grasp big objects, reach, write, and type or handle small objects for 7 hours a day.  (*Id.*)  He further stated that he frequently lifted 200 pounds, and that 200 pounds was the heaviest weight he would lift.  (Tr. 112.)

In the course of applying for benefits, Plaintiff was interviewed by a field office employee for the Commissioner.  In the interview, which was compiled into an adult disability report, Plaintiff conveyed that he was five feet, six inches tall and weighed 270 pounds.  (Tr. 109.)  He further indicated that he stopped working on November 1, 2006 due "kidney problems, tumors, cancer, diabet[e]s, [and] high blood pressure."  (Tr. 110.)  These issues caused "[s]evere pain in [his] right side and extreme nausea [which] prevented job performance."  (*Id.*)  However, he later testified at the hearing that he stopped working because there "was no more

2

work" and he was laid off.  (Tr. 32.)  He collected unemployment benefits for six months.  (Tr. 32-33.)  His union was unable to find him new work and the company he worked for eventually closed.  (Tr. 34.)  Plaintiff testified that he stopped looking for work when he began having pain in his right flank.  (Tr. 35.)  He further testified that the pain "started about April" of 2007 and "[f]rom there, [he] went to the [emergency room] of the hospital."  (*Id.*)  As discussed below, the record indicates that he actually went to the emergency room in March of 2007.

On March 23, 2007, Plaintiff went to the emergency room because of pain in the right upper quadrant of his abdomen.  (*See* Tr. 139 (reporting the visit the following week).)  Plaintiff was told the he had kidney cancer.  (Tr. 35.)  He was diagnosed with a renal mass, mild renal insufficiency, and diabetes mellitus.  (Tr. 140.)  On April 10, 2007 Plaintiff saw Dr. Guido Dalbagni at Memorial Hospital for an initial consultation and to discuss treatment options.  (Tr. 380-82.)  Dr. Dalbagni informed Plaintiff that, due to the position of the tumor, a radical nephrectomy – removing the entire cancerous kidney – would be necessary.  (Tr. 382.)  Plaintiff saw Dr. Ilya Glezerman for a preoperative evaluation on April 27, 2007 and Dr. Shellie Gumbs for a perioperative risk assessment on May 3, 2007.  (Tr. 365-67, 359-61.)  He reported to Dr. Gumbs that he could walk one mile on level ground without shortness of breath or chest pain, but he did have shortness of breath with inclines or climbing a flight of stairs.  (Tr. 359.)  The doctor found that despite his high cholesterol, diabetes, hypertension, and exercise limitations, "he ha[d] no absolute contraindications to surgery and [was] in his optimal medical condition to undergo the procedure."  (Tr. 360.)  On May 9, 2007, Dr. Joel Sheinfeld at Memorial Hospital performed a radical nephrectomy and freed all abnormal adhesions.  (Tr. 164-73, 495-96.)  The tumor was a renal cell carcinoma with no involvement of the lymph nodes.  (Tr. 164.)

The day after the surgery, Plaintiff again complained of pain on the right side of the abdomen.  (Tr. 158, 160.)  He rated the pain at eight to ten on a ten-point scale, but did not have chest pain, shortness of breath, cough or chills.  (Tr. 160.)  In the days following the surgery, Plaintiff was "resistant" to physical therapy and "require[d] a lot of encouraging/ motivation."  (Tr. 152-53.)  After complaints of dizziness and unsteadiness, Plaintiff was issued a cane.  (Tr. 157.)  He was released from the hospital on May 18, 2007.  (Tr. 164.)  His discharge summary indicated that he was in stable condition and his physical examination was within normal limits.  (*Id*.)  The discharge diagnosis was renal cell carcinoma right kidney, acute rental failure (resolved), type II diabetes, hypercholesterolemia, and hypertension.  (Tr. 164-65.)  On June 4, 2007, Plaintiff called Dr. Sheinfeld's office to request additional Vicodin.  (Tr. 315.)  He reported that he had been taking aspirin for pain for a few days, but was instructed to stop taking aspirin and to take Extra Strength Tylenol instead.  (*Id.*)  On June 7, 2007, Plaintiff saw Dr. Sheinfeld for a postoperative evaluation.  (Tr. 310-13.)  He noted that Plaintiff's pain was "slowly improving" and that his incision was "well healed."  (Tr. 310, 312.)

On June 26, 2007, Dr. P. Seitzman, a state agency oncologist, reviewed Plaintiff's medical record.  (Tr. 174.)  The doctor noted that Plaintiff alleged kidney disease, cancer, and diabetes and that he had not been able to work since November 2006 due to nausea and pain on his right side.  (*Id*.)  The doctor further noted that the medical evidence showed a nephrectomy with no evidence that the cancer cells had spread to the lymph nodes.  (*Id*.)  Based on this, the state agency oncologist opined that the condition would not last twelve months.  (*Id*.)  On July 6, 2007, Plaintiff alleged that he had a "lotta lotta pain" at the surgery site and went to a pharmacy to attempt to obtain more Vicodin.  (Tr. 306.)  He stated that he had been taking one Vicodin a day for pain, but had no other symptoms.  (*Id*.)  The pharmacy attempted to contact Dr.

Sheinfeld, but the doctor refused to order additional Vicodin and directed Plaintiff to take Extra Strength Tylenol instead.  (*Id*.)

On July 13, 2007, Plaintiff was evaluated by Dr. Jerome Caiati, a consultative examiner. (Tr. 176-79.)  Dr. Caiati noted that Plaintiff had been obese for ten years and had been diagnosed with hypertension, diabetes, and high cholesterol.  (Tr. 176.)  Plaintiff conveyed that he had cancer of the right kidney which was treated with a radical nephrectomy and was experiencing "postoperative site pain."  (*Id*.)  Plaintiff said he was unable to cook and clean because of the pain at the surgery site.  (Tr. 177.)  He could do some laundry but could not go shopping.  (*Id*.) He was, however, able to shower, bathe, and dress himself.  (*Id*.)  He reported that he spent his time watching television, listening to the radio, reading and socializing with friends.  (*Id*.)  Dr. Caiati noted that the claimant appeared to be in "no acute distress" with a normal gait.  (*Id.*)  He walked on his heels and toes "with minimal difficulty" and, though he held on to the table, was able to do a full squat.  (*Id.*)  His stance was normal, and Plaintiff used a cane for "pain and balance" but Dr. Caiati observed that Plaintiff's "gait with and without the device [was] normal." (*Id.*)  Plaintiff did not need help getting on or off the exam table.  (*Id.*)  He was also able to rise from a chair without trouble and changed for the exam without assistance.  (*Id.*)  Plaintiff had the full range of motion in his cervical spine, shoulders, elbows, forearms, and wrists and no abnormality in his thoracic spine.  (Tr. 178.)  He had lumbar spine flexion to ninety degrees, extension and lateral flexion to thirty degrees, and rotation to seventy degrees.  (*Id.*)  His hip flexion was to one-hundred degrees, with internal rotation to forty –five degrees and external rotation to ninety degrees bilaterally.  (*Id.*)  The straight leg raising test was negative bilaterally, his joints were stable and non-tender, and he had strength of five out of five in his upper and lower extremities.  (*Id.*)  His hand and finger dexterity were intact and his grip strength was five

out of five bilaterally.  (*Id.*)  Dr. Caiati reported that there was some tenderness in the right flank at the operative site.  (*Id.*)  The doctor's prognosis on the postoperative pain at the operative site was "fair with recuperation."  (Tr. 179.)  Dr. Caiati's overall opinion was that Plaintiff could sit, stand, and walk without restriction.  (*Id.*)  Additionally, he could reach, push, and pull unrestricted.  (*Id.*)  Dr. Caiati opined that Plaintiff could climb and bend with minimal limitations and had a "mild" lifting limitation due to the operative site pain.  (*Id.*)

On September 6, 2007, Plaintiff saw Dr. Sheinfeld for a follow-up visit.  (Tr. 304.)  Dr. Sheinfeld wrote that Plaintiff had "recovered well" and was "tolerating a regular diet."  (*Id.*)  The doctor noted that Plaintiff did not have any nausea, vomiting, diarrhea or constipation.  (*Id.*)  Plaintiff continued to complain of pain at the incision site, but an ultrasound revealed no abnormalities.  (*Id.*)  On November 5, 2007, Plaintiff had a computerized tomography ("CT") scan.  (Tr. 294-95.)  The findings were that Plaintiff was "status post interval right nephrectomy" with "no evidence of local recurrence."  (Tr. 294.)  Additionally, the liver, spleen, pancreas, left adrenal gland and left kidney were unremarkable.  (*Id.*)  No abdominal pelvic lymphadenopathy or ascites were present.  (*Id.*)  There were also no destructive bone lesions.  (*Id.*)

After a "no-show[]" for a follow-up appointment with Dr. Sheinfeld, Plaintiff "showed up" the following week on November 14, 2007 "stating [that] he needed to see a doctor because he was in so much pain."  (Tr. 285.)  The exam was normal, but they arranged a consultation with a pain specialist, and were able to find Plaintiff an appointment for later the same day.  (*Id.*)  Plaintiff had already left the facility before the pain specialist appointment was obtained and was, therefore, "resistant" to returning, but agreed when he was advised that the next available appointment would not be for a week.  (*Id.*)  When he returned, he saw Dr. Amitabh Gulati for an initial consultation.  (Tr. 287-89.)  Plaintiff stated that he had "deep," "constant" pain above

and below the incision site that worsened with eating.  (Tr. 287.)  He denied any diarrhea, constipation, nausea or vomiting.  (*Id*.)  He expressed that he had a good appetite and was able to sleep "okay," except when he slept on his right side.  (*Id*.)  He denied any pain when passing stool or urine.  (*Id*.)  He conveyed that he was "able to walk okay," and denied any shortness of breath, chest pain, weakness, or pain with movement.  (*Id*.)  "In fact, [Plaintiff reported] movement actually helps his pain[,] especially after he eats."  (*Id*.)  Plaintiff stated that he had "a little bit of pain when touching his right side abdominal scar."  (*Id*.)  He could bend forward and backward and to his left and right with a mild increase in his pain.  (*Id*.)  Dr. Gulati noted that the patient was alert and in "no acute distress."  (Tr. 288.)  He had "full range of motion of his thoracolumbar spine with good flexion and extension of his back" with "no facet joint tenderness."  (*Id*.)  There was no paraspinal or muscular tenderness of the thoracolumbar spine, but there was "mild tenderness to palpation of his right upper quadrant and right lower quadrant."  (*Id*.)  The doctor noted that Plaintiff's incision was "well healed."  (*Id*.)  Dr. Gulati's impression was that Plaintiff's abdominal pain was likely secondary to adhesions, but noted that the recent CT scan had not shown any lesions.  (*Id*.)  The doctor prescribed Nortriptyline and Ultracet.  (*Id*.)

On November 19, 2007, Dr. Marcia Kalin conducted an initial diabetes assessment.  (Tr. 267-75.)  Plaintiff was asymptomatic and had never taken insulin.  (Tr. 267.)  Plaintiff stated that he had a sharp pain at the incision site that "comes and goes," and lying on his right side was the precipitating factor.  (Tr. 269.)  He said that he required extra rest and "sometimes fe[lt] depressed."  (*Id*.)  He had a steady gait and a full range of motion.  (Tr. 270.)

On December 12, 2007, Plaintiff saw Dr. Gulati for a follow-up appointment.  (Tr. 256-59.)  Plaintiff's abdominal pain had "minimally improved" with the prescribed medication.  (Tr.

256.)  Plaintiff conveyed that his pain was "bearable" except for when he ate.  (*Id.*)  After eating, Plaintiff "has pain [for] approximately 15-20 minutes."  (*Id.*)  "Upon deep palpation, [Plaintiff] ha[d] some sensitivity and tenderness in the right upper and right lower quadrants."  (*Id.*)  He had no tenderness in the thoracic or lumbar vertebral facet joints or sacroiliac joints.  (*Id.*)  He had full range of motion of all four extremities, good range of motion in his back, and was in no acute distress.  (*Id.*)  Dr. Gulati again expressed that the pain was likely due to adhesions, but he noted that the CT scan conducted in November of 2007 did not reveal any adhesions.  (256-57.)  He also noted that the CT scan showed "interval scarring" which might explain the "colicky nature" of Plaintiff's pain.  (*Id.*)

On December 27, 2007, Plaintiff returned to Dr. Sheinfeld's office with disability paperwork and requested that the office fill out the forms and say that Plaintiff had been "unable to work for the past 12 months."  (Tr. 250.)  Registered Nurse Andrien Schwartz "[a]dvised [Plaintiff] that from an oncology surgery standpoint we cannot say that [he] has been unable to work."  The nurse's notes continued:

> Right nephrectomy performed 5/2007.  Since then, patient has been cleared to return to work – incision is healed, physical exam is negative, CT scans, renal ultrasounds, and labs have been [within normal limits].  We have referred [Plaintiff] to pain management for continued complaints of pain and they are following up with [him] on this issue.  There are no functional limitations from a surgical standpoint.  Advised [Plaintiff] that if he feels he is unable to work from a pain standpoint he needs the pain management office to verify this as we do not manage what their plan of care is.

(*Id.*)  On the same day, Plaintiff also underwent a thyroid ultrasound which revealed a small heterogeneous nodule in the right lobe of the thyroid, without any thyroid enlargement.  (Tr. 247.)  He also was seen for a nutritional assessment.  (Tr. 251.)  Over the eight months prior to the assessment, his weight had decreased by three percent to a weight of 122.7 kg (or approximately 270 pounds).  (Tr. 252.)  He reportedly ate all of his meals at a local Spanish

restaurant. (*Id.*) He said that the owners would be willing to prepare food for him in ways he requested in order to "help with his weight." (*Id.*) Plaintiff conveyed that he was "frustrated by his continued pain since his surgery" and that the pain had "made it impossible for him to work as well as walk." (*Id.*)

On January 14, 2008, Plaintiff returned to Dr. Gulati for a follow-up appointment. (Tr. 242-45.) Plaintiff continued to report that he had right upper quadrant pain that worsened with eating. (Tr. 244.) He said that he "noticed an improvement of his pain" with medication, but it was not "significant." (*Id.*) Plaintiff stated that his pain prevented him from working. (*Id.*) Dr. Gulati noted that Plaintiff was in no acute distress but appeared "somewhat frustrated." (*Id.*) Plaintiff wanted Dr. Gulati to complete a disability evaluation, but the doctor said that the pain management service did not complete disability evaluations, and that Plaintiff would have to pursue that with his primary care physician, Dr. Joel Sheinfeld, who is a urologist. (*Id.*) Dr. Gulati's notes continue:

> While the discussion was occurring, the patient stated that if he has to go back to work, the chances are that he will hurt and the pain will become severe. If the pain becomes severe, the patient stated that he will hire a lawyer to sue the hospital unless we get him disability insurance. We discussed with this patient to please notify our service (card given) if he has increasing pain so that we may assist him in relieving his pain.

(Tr. 244-45.) Dr. Gulati said that, after further conversation, Plaintiff relaxed and agreed to an increase in his Neurontin prescription. (Tr. 245.)

On February 13, 2008, Plaintiff saw Dr. Nathalie Rigaud at the Joseph P. Addabbo Family Health Center for an initial evaluation. (Tr. 616-24.) Plaintiff continued to complain of tenderness. (Tr. 617.) On March 14, 2008, Dr. Gulati saw Plaintiff again at Memorial Hospital. (Tr. 232-35.) The doctor noted that although Plaintiff complained of "persistent right-sided abdominal pain," he "had multiple imaging studies showing no progression of of [the] disease and

no obvious etiology for his pain." (Tr. 232.) Plaintiff said his pain still improved with medication but it was not sufficient. (*Id.*) The physical examination revealed tenderness in the right upper quadrant, but the doctor wrote that Plaintiff was in no acute distress. (*Id.*) Dr. Gulati increased Plaintiff's dosage of Tramadol and Neurontin. (*Id.*) Plaintiff asked for a letter describing his pain symptoms and medication. (*Id.*) On March 17, 2008, the doctor wrote a note simply stating the following: "This is to inform you that I am a pain specialist and that Mr. Mario Lopez is under my care for the assessment and treatment of his pain." (Tr. 599.)

On March 27, 2008, Plaintiff returned to Memorial Hospital. (Tr. 221-224.) Dr. Ilya Glezerman, the attending physician, noted that Plaintiff was "an obese gentleman in no acute distress." (Tr. 221.) She noted that Plaintiff's renal function was stable, but he likely had interstitial disease and stage III kidney disease. (Tr. 221-22.) She directed him to return on an "as needed basis." (Tr. 222.) On the same date, internist Dr. Nathalie Rigaud wrote a letter stating that Plaintiff had been a patient of the Joseph P. Addabbo Family Health Center since February 13, 2008. (Tr. 604.) She noted his history of a nephrectomy, diabetes, hypertension, and chronic pain since his operation. (*Id.*)

Dr. Richard J. Wagman, an internist and non-examining medical expert, testified at Plaintiff's June 24, 2008 hearing. (Tr. 46-52.) Based on his review of Plaintiff's medical records and his observation of Plaintiff's testimony, he opined that Plaintiff's conditions would cause "minimal" limitations. (Tr. 48.) He stated that Plaintiff's medical records actually showed "very little in spite of a big chart." (Tr. 47.) Dr. Wagman testified that Plaintiff had a renal cell carcinoma that was removed and Plaintiff had no local metastases. (*Id.*) The doctor noted that Plaintiff had conveyed that movement helped his pain, that he also suffered from diabetes and high blood pressure, and that he had been non-compliant with some of his appointments and his

diet.  (*Id*.)  Regarding Plaintiff's position overall, he opined that Plaintiff was "very fortunate [that] his tumor was discovered relatively early and removed completely."  (Tr. 48.)  On cross-examination, Dr. Wagman testified that Plaintiff's alleged degree of pain appeared to be "vastly[,] vastly overdone" and that there was no evidence of pain at the level of a 10, as Plaintiff testified.  (Tr. 49; *see* 44.)  Instead, Dr. Wagman said the pain appeared to be "more of a one" on the one to ten scale.  (Tr. 49.)  The doctor testified that if Plaintiff's reports of pain were found to be credible, then Plaintiff would not be able to perform medium work, which requires the ability to stand, walk, and sit for six hours out of an eight hour day and lift up to fifty pounds occasionally and twenty-five pounds frequently.  (Tr. 51-52.)  However, the doctor testified that he did not find the Plaintiff's reports to be credible.  (Tr. 52.)  He further testified that there was nothing in the record that would preclude Plaintiff from performing light work.  (Tr. 51.)

In the "Function Report" submitted in support of his application, Plaintiff stated that he took care of his seven year-old daughter with help from her godparents.  (Tr. 118.)  He helped her get ready for school and with her homework.  (*Id.*)  He walked his daughter to school and back, which was two or three blocks away, sometimes with help from his older children.  (Tr. 40, 45.)  Plaintiff spent his days watching television and reading the newspaper.  (Tr. 118.)  He took his medication and attended his medical appointments with assistance from his son.  (*Id.*)  His son, along with friends, also helped him by preparing food because he could no longer cook any more.  (Tr. 119.)  He reported that he did not require any help with his personal needs and grooming and was able to do some light cleaning and organization.  (Tr. 119-20.)  He needed help lifting heavy things and was no longer able to drive.  (Tr. 120.)  He was able to go grocery shopping and use public transportation, but could no longer play sports or attend parties.  (Tr. 120-22.)  He did not use the subway because "there's a lot of jumping," but traveled by bus.  (Tr.

42.)  He testified that he could walk four blocks, carry less than ten pounds, stand for two hours

and sit for one hour.  (Tr. 42-43.)

After the ALJ Hearing, Plaintiff submitted three pieces of new evidence to the Appeals

Council.  First, Plaintiff submitted a medical assessment from Dr. Jean-Baptiste Odiel dated

August 19, 2008.  (Tr. 4, 630-31.)  According to the submission, Dr. Odiel first saw Plaintiff on

July 28, 2008, and Plaintiff had visits every two weeks.  (Tr. 630.)  Dr. Odiel noted that Plaintiff

was status post right nephrectomy with "incisional and surgical site residual pain."  (*Id*.)  In

response to the questions asking for the doctor's opinion about functional limitations, he began

all of his answers with "the patient reports…."  (Tr. 631.)  The doctor stated that Plaintiff

reported "persistent sharp and throbbing pain…with activity and at rest (sitting) which markedly

interrupts his attention and concentration for necessary tasks."  (*Id*.)  Plaintiff also reported that

"the pain interferes with his ability to sit still for extended periods of time" and therefore he

cannot sit for more than thirty minutes.  (*Id*.)  Plaintiff told Dr. Odiel that he needed help from

his daughter to lift laundry and food shopping bags and that "attempting to lift or hold heavy

objects (e.g. a hammer) at shoulder level brings an increase in pain."  (*Id*.)  The second piece of

new evidence was a letter from Dr. Margarita Dela Pena and Dr. Shantha Ganesan dated March

16, 2010.  (Tr. 4, 632.)  The letter conveyed that Plaintiff was being treated at the Pain

Management Clinic at Kings County Hospital beginning July of 2009.  (Tr. 632.)  Plaintiff was

being treated for the same right abdominal pain and the letter states that "the pain is constant and

is exacerbated by walking."  (*Id*.)

The final piece of new evidence was a letter dated March 1, 2010 from Dr. Edward Allen.

(Tr. 4, 633.)  Dr. Allen stated that Plaintiff was a patient at SUNY Downstate Medical Center

Family Health Services since January 2008.  (Tr. 633.)  He wrote that Plaintiff's pain "is

constant and hinders his performance of many of his usual daily activities, including his regular

job." He further conveyed that Plaintiff's pain is "exacerbated by many simple movements

including walking, twisting and any kind of heavy lifting," but "[t]he source of his pain is still to

be determined." (*Id.*) Dr. Allen referred Plaintiff to a pain management specialist and "advised

him to limit strenuous activities until his pain can be adequately controlled…and investigations

can reveal a cause for his pain." (*Id*.) However, the Commissioner argues that the January 2008

date for the first treatment was a typographic error because Plaintiff conveyed that, as of the June

24, 2008 hearing date, his only treating physicians were those at Memorial Hospital and Dr.

Rigaud. (Tr. 37-38; *see* Memorandum of Law in Support of the Defendants Motion for

Judgment on the Pleadings ("Def. Mot.") at 26.) The Commissioner accordingly argues that all

of the additional evidence submitted to the Appeals Council relates only to medical treatment

that occurred after the July 11, 2008 ALJ decision. (Def. Mot. at 26.) Plaintiff refers to the Dr.

Allen letter when summarizing the medical evidence in his opposition motion, but he does not

respond to the Commissioner's argument on this point. (*See* Memorandum of Law in Opposition

to Defendant's Motion for Judgment on the Pleadings and in Support of Plaintiff's Cross Motion

for Judgment on the Pleadings ("Pl. Opp.") at 4.) It appears, therefore, that Plaintiff concedes

that the January 2008 date is an error.


## II.      DISCUSSION

### A.      Standard of Review

Judicial review of disability insurance benefit determinations is governed by 42 U.S.C.

§ 1383(c)(3), which expressly incorporates the standards established by 42 U.S.C. § 405(g). In

relevant part, § 405(g) provides that "[t]he findings of the Commissioner of Social Security as to

any fact, if supported by substantial evidence, shall be conclusive[.]"  Thus, if the

Commissioner's decision is supported by "substantial evidence" and there are no other legal or

procedural deficiencies, the decision must be affirmed.  The Supreme Court has defined

"substantial evidence" to connote "more than a mere scintilla.  It means such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*,

402 U.S. 389, 401 (1971).

> **B.     Disability Determinations**

To qualify for disability insurance, a claimant must be deemed "disabled" as the term is

defined by 42 U.S.C. § 423(d)(1)(A):

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

42 U.S.C. § 423(d)(1)(A).  A "physical or mental impairment" consists of "an impairment that

results from anatomical, physiological or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The Commissioner determines whether a claimant meets the statutory definition of

"disabled" in five, successive steps (the "Analysis").  20 C.F.R. § 404.1520.  The sequential

evaluation process requires that: (1) if the claimant is gainfully employed then he will be found

"not disabled"; (2) if the claimant suffers from a "severe" impairment, i.e., one that significantly

limits his physical or mental ability to do basic work activities, then the analysis proceeds to the

third step; (3) if the claimant's "severe" impairment meets or equals an impairment listed in 20

C.F.R. Part 404, Subpart P, Appendix 1, and has lasted or is expected to last for a continuous

period of at least twelve months, then the claimant is disabled, if not, the analysis proceeds to the

fourth step; (4) if, after determining the claimant's residual functional capacity, it is determined

that the claimant can perform past relevant work, he will not be found disabled; and (5) if the

claimant cannot perform any work he has done in the past, and the Commissioner determines

that, in conjunction with his residual functional capacity, age, education, and past work

experience, he cannot engage in other substantial gainful work reasonably available in the

national economy, he is disabled. *Id.*

When determining whether or not a particular claimant is "disabled," the combined effect

of multiple impairments must be taken into consideration by the Commissioner:

> [i]n determining whether an individual's physical or mental impairment or
> impairments are of a sufficient medical severity that such impairment or
> impairments could be the basis of eligibility under this section, the Commissioner
> of Social Security shall consider the combined effect of all of the individual's
> impairments without regard to whether any such impairment, if considered
> separately, would be of such severity. If the Commissioner of Social Security
> does find a medically severe combination of impairments, the combined impact of
> the impairments shall be considered throughout the disability determination
> process.

42 U.S.C. § 1382c(a)(3)(G). The claimant bears the burden of proving disability. *Mimms v.*

*Heckler*, 750 F.2d 180, 185 (2d Cir. 1984). In weighing the medical opinion evidence, the ALJ

is obligated to adhere to the rules set forth in 20 C.F.R. § 404.1527. These rules provide that,

generally, more weight is given to the following: (1) opinions provided by physicians who have

actually examined the claimant; (2) opinions provided by a claimant's treating physicians;

(3) opinions supported by objective relevant evidence; (4) opinions that are more consistent with

the record evidence as a whole; (5) opinions of specialists about medical impairments related to

their area of expertise; (6) opinions that may be supported by any other factors the claimant

brings to the Commissioner's attention. 20 C.F.R. § 404.1527(c)(1)-(6). However, the

Commissioner must give a treating physician's opinion on the nature and severity of an

impairment "controlling weight" if his or her opinion is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in [the claimant's] case record."  20 C.F.R. § 404.1527(c)(2).  This is the so-called

"treating physician rule."  "While the opinions of a treating physician deserve special respect . . .

they need not be given controlling weight where they are contradicted by other substantial

evidence in the record."  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (internal citations

omitted).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  *Id.*

### C.      The ALJ's Decision

On July 11, 2008, ALJ Rosenbaum issued a written decision determining that Plaintiff

was not disabled.  (Tr. 16-23.)  In performing the analysis, he concluded that Plaintiff met the

requirements for disability insured status through December 31, 2011.[2]  (Tr. 16, 18.)  He also

found that Plaintiff "has not engaged in substantial gainful activity since November 1, 2006, the

alleged onset date."  (Tr. 18 (internal citation omitted).)  The ALJ determined that Plaintiff

suffered from "the following severe impairments:  Renal cancer, status-post right radical

nephrectomy, diabetes mellitus, hypertension and obesity."  (*Id.* (internal citation omitted).)

However, he concluded that Plaintiff "does not have an impairment or combination of

impairments that meets or medically equals one of the listed impairments…."  (Tr. at 19.)  This

determination required the ALJ to continue to the fourth step and evaluate Plaintiff's residual

functional capacity.

#### 1.   *Residual Functional Capacity*

Residual functional capacity is what a claimant remains capable of doing despite any

impairments, severe or otherwise.  20 C.F.R. § 404.1545(a).  The residual functional capacity is

---

[2] To qualify for social security disability ("SSD") benefits, one must be both disabled and insured for disability benefits.  42 U.S.C. § 423(a)(1)(A) and (C); 20 C.F.R. §§ 404.101, 404.120, and 404.315(a).  The last date that a person meets these requirements is commonly referred to as the date last insured, or the "DLI."  Plaintiff's DLI is December 31, 2011 and for him to qualify for SSD benefits, the onset of his disability must have occurred on or before December 31, 2011.

determined by considering all relevant evidence, consisting of physical abilities, symptoms including pain, and descriptions, including those provided by the claimant, of limitations which result from the symptoms.  20 C.F.R. § 404.1545.  Physical capabilities are determined by evaluation of exertional and nonexertional limitations in performing a certain category of work activity on a regular and continuing basis.  20 C.F.R. § 404.1567; 20 C.F.R. § 404.1569a.  To determine whether a claimant can do a certain category of work, the ALJ must determine the claimant's strength limitations, or exertional capacity, which include the ability to sit, stand, walk, lift, carry, push and pull.  20 C.F.R. § 404.1569a(a).  Nonexertional limitations include "difficulty functioning because [claimant] is nervous, anxious, or depressed" as well as "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching." 20 C.F.R. § 404.1569a(c)(i); 20 C.F.R. § 404.1569a(c)(vi).

A claimant's residual functional capacity can only be established when there is substantial evidence of each physical requirement listed in the regulations.  *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990).  The ALJ's finding must specify the functions the claimant is capable of performing – conclusory statements regarding the claimant's capacities are insufficient.  *Id.*; *Kendall v. Apfel*, 15 F. Supp. 2d 262, 268 (E.D.N.Y. 1998).  The residual functional capacity is then used to determine particular types of work a claimant could perform. 20 C.F.R. § 404.1545(a)(5).  As defined in 20 C.F.R. § 404.1567(c), "[m]edium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he or she can also do sedentary and light work."  Medium work is in the middle of the five categories of work which include very heavy, heavy, medium, light, and sedentary.  20 C.F.R. § 404.1567.

At the fourth step of the analysis, ALJ Rosenbaum determined that Plaintiff retained the residual functional capacity for medium work.  (Tr. 19-22.)  Carpentry, as generally performed in the national economy, is classified as medium work, therefore the ALJ concluded that Plaintiff could return to his past employment.  (Tr. 23 (citing the Dictionary of Occupational Titles, Sections 860.381-022, 760.684-014.)  The ALJ followed a two-step process for considering Plaintiff's symptoms.  (Tr. 19.)  First, an ALJ has to "determine[] whether there is an underlying medically determinable physical or mental impairment[]…that [could] be shown by medically acceptable clinical and laboratory diagnostic techniques" and "could reasonably be expected to produce the claimant's pain or other symptoms."  (Tr. 19-20.)  If a physical or mental impairment of that sort is shown, the ALJ then must "evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities."  (Tr. 20.)  For the second step, "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the [ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record."  (*Id.*)  Following this two-step process, the ALJ found that "the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (*Id.*)  However, the ALJ found the claimant to be "credible to the extent that he would have difficulty lifting heavy objects" and stated that "[t]he residual functional capacity was accordingly reduced to accommodate this limitation."  (Tr. 20-21.)

18

D.      **Substantial Evidence**

"This Court will affirm the ALJ's discounting of a claimant's subjective complaints if substantial evidence supported his determination."  *Rivera v. Astrue*, No. 11-CV-4132, 2012 WL 3307342, *9 (E.D.N.Y. August 11, 2012) (internal quotation marks omitted).  As mentioned above, the Supreme Court has defined "substantial evidence" to connote "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  A reviewing court "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir.1991) (citing *Valente v. Sec'y of H.H.S.,* 733 F.2d 1037, 1041 (2d Cir.1984)).

The ALJ based his determination on the objective medical evidence, giving "great weight to the longitudinal treatment history as presented in the [Memorial Hospital] Record."  (Tr. 21.) The medical records and imaging studies from Memorial Hospital indicated that Plaintiff had no functional limitations, that he was cleared to return to work, that there was no progression of Plaintiff's cancer, and "no obvious etiology for his pain."  (*Id*; *ante* at 8-10.)  The ALJ noted that the record "failed to reveal any evidence to substantiate that the claimant has had any limitations subsequent to his surgery which would prevent him" from participating in substantial gainful activity:

> Contrarily, regarding the claimant's renal cancer and resultant treatment, the record gives a replete history of early detection and immediate treatment[,] both of which have paved the way for a well-documented, excellent recovery. Similarly, the record is void of any associated limitations as a result of the claimant's diabetes, hypertension and/or obesity [-] all cases except the latter of which are controlled with medications, provided the claimant is compliant.

(Tr. 21.)  Regarding obesity, he wrote that "there is no indication and/or allegation in the record that the claimant has any limitations…[or] other symptom[s] that would naturally arise due to the

19

claimant's obesity.  (Tr. 22.)  ALJ Rosenbaum also considered Plaintiff's activities of daily

living, including taking care of his seven year old daughter, socializing, and eating out.  (Tr. 20-

21.)  He also noted that Plaintiff testified that he stopped working because he was laid off in

2006 due to an unavailability of work.  (Tr. 20.)  Additionally, he relied on Dr. Wagman's

testimony that the medical record indicated no local metastases, and that there was "no medical

evidence to document [Plaintiff's] allegations of severe pain."  (Tr. 21-22.)  The ALJ also

"emphasize[d]" that the record indicated that Plaintiff, "in pursuit of his disability assessment in

January 2008, stated to the attending physicians that he planned to hire a lawyer to sue the

hospital if he had to go back to work."  (Tr. 21; *see* Tr. 244-45; *ante* at 9.)  He additionally

referred to Dr. Caiati's assessment that Plaintiff had a "normal gait with and without his cane and

[a] normal range of motion as well as strength in all of his extremities" and that he had "no

restrictions sitting, standing, and walking and…minimal limitations climbing and bending due

to…pain at his incisional site."  (Tr. 22.)  The ALJ underscored that he gave some weight to

Plaintiff's complaints in deciding the residual functional capacity:

> Regardless of the evidence to the contrary, the undersigned has given credence to
> the claimant's allegations and testimony that he is still experiencing some
> recurrent pain at his incisional site and has given him the benefit of the doubt by
> affording him the reasonable accommodation described above[: modification of
> the residual functional capacity to reflect that Plaintiff would have difficulty with
> lifting heavy items.]

(Tr. 22; *see* Tr. 20-21.)

Plaintiff challenges the ALJ's reliance on Dr. Wagman's testimony.  (Pl. Opp. at 8.)

However, this argument ignores that the ALJ gave great weight to the records from Memorial

Hospital regarding Plaintiff's surgery and pain management visits.  Plaintiff then makes an

argument that the ALJ overlooked a potential disease – "post-surgery pain syndrome:"

> Post-surgery pain syndrome is well documented in the medical literature,
> including that of the government's own National Institutes of Health.  It is not an
> uncommon occurrence.  The condition can be chronic, debilitating, and resistant
> to treatment.  Dr. Wagman's failure to even acknowledge the existence of the
> post-surgery pain phenomenon lends additional dubiety to his absolute certainty
> that the plaintiff does not suffer significant pain.  While the ALJ declared Dr.
> Wagman's testimony to be "most important[]" (T21), that testimony is, in fact, of
> only limited value.

(Pl. Opp at 8.)  The Court finds this argument to be an unconvincing one.  There is no diagnosis

of this syndrome from any of Plaintiff's doctors.  Further, there is no indication that Plaintiff's

pain management specialist at Memorial Hospital, Dr. Gulati, was even considering this

syndrome in the context of Plaintiff's treatment.  This is true despite a significant number of

treatment records from Dr. Gulati.  "[The Commissioner] will consider only impairment(s)

[Plaintiff] say[s] [he] ha[s] or about which [it] receive[s] evidence."  20 C.F.R. § 404.1512(a).

Therefore, Plaintiff cannot successfully argue that the ALJ and Dr. Wagman improperly failed to

"acknowledge" this syndrome.  Additionally, regarding Dr. Wagman's credibility, the ALJ did

not rely solely, or even primarily, on Dr. Wagman's testimony.  Instead, as mentioned above, he

gave great weight to the extensive records from Memorial Hospital.  The sentence Plaintiff

quotes to indicate that Dr. Wagman's testimony was the "most important" appears to relate to the

apparently successful treatment of Plaintiff's cancer:  "[m]ost importantly, Richard J. Wagman,

the medical expert, testified that the claimant was diagnosed with renal cancer with no local

metastases and a right, total nephrectomy was successfully performed on May 7, 2007."  (Tr. 21-

22.)

     Plaintiff argues that the ALJ "predicated his conclusions on the findings of Dr. Wagman

and Dr. Caiata [sic]" even though "*neither physician ever stated that the plaintiff can do*

*medium-level work*."  (Pl. Opp. at 9 (emphasis in original).)  However, at the hearing, Dr.

Wagman testified that Plaintiff would only be unable to perform medium work if Plaintiff's pain

allegations were found to be credible.  (Tr. 52; *see* ante at 11.)  He testified clearly that he did *not* think Plaintiff's complaints of pain were credible, thereby indicating his opinion that Plaintiff could perform medium work.  (*Id.*)  Also, Dr. Caiati described what he felt to be "minimal" limitations with climbing and bending, no limitations with sitting, standing, and walking, and a "mild" lifting limitation.  (Tr. 179.)  Plaintiff further argues that Dr. Wagman and Caiati are not specialists, but general internists, and for that reason, "the reliability of such [opinions] must be questioned."  (Pl. Opp. at 9.)  Plaintiff also takes issue with their opinions given that Dr. Caiati's was based on a single examination, and Dr. Wagman did not conduct an exam at all.  (*Id.*)  He argues that the ALJ had "an affirmative duty to probe more deeply – perhaps by ordering a consultative examination by a physician more suited to evaluating chronic pain."  (*Id.*)  Again, this argument ignores the numerous records from Memorial Hospital which include treatment records from Dr. Sheinfeld, a urologist, and Dr. Gulati, Plaintiff's pain management specialist. The ALJ generally has an affirmative duty to develop the record even when the Plaintiff proceeds with some form of representation.  *Perez v. Chater,* 77 F.3d 41, 47 (2d Cir.1996). However, "[w]hen the record contains sufficient medical evidence concerning Plaintiff's impairment…the ALJ is not required to seek additional evidence."  *Martinez-Paulino v. Astrue*, No. 11-CV-5485, 2012 WL 3564140, *13 (S.D.N.Y. August 20, 2012); *see* 20 C.F.R. § 404.1512(e).

Finally, Plaintiff alleges that the additional evidence submitted to the Appeals Council demonstrates that Plaintiff "continued to suffer from post-surgical pain for years after the nephrectomy."  (P. Opp at 9.)  Plaintiff appears to argue that this evidence should support Plaintiff's credibility, but was, instead, inappropriately "brushed aside" by the Appeals Council. (*Id.*)  "If new and material evidence is submitted, the Appeals Council shall consider the

additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. §404.970(b).  Further:

> The Second Circuit has defined new evidence as evidence that has not been considered previously and is not merely cumulative of what is already in the record.  Material evidence refers to evidence that is both relevant to the claimant's condition during the time period for which benefits were denied and probative. The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the Secretary to decide the claimant's application differently.

*Knight v. Astrue*, No. 10-CV-5301, 2011 WL 4073603, at *12 (E.D.N.Y. September 13, 2011) (internal citations omitted); *see also Jones*, 949 F.2d at 60.  The Court also notes that "[when] plaintiff's evidence [is] submitted to the Appeals Council, and not to this [reviewing] Court directly, there is no requirement for plaintiff to show good cause for [his] failure to submit the evidence at an earlier point." *Knight*, 2011 WL 4073603, at *12 (citing *Perez,* 77 F.3d at 45). The Appeals Council considers any new and material evidence in the context of the entire record, and "will then review the [ALJ's decision] if it finds that the [ALJ's] action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. §404.970(b).

Here, as stated above, *ante* at 2, the Appeals Council did not find reason to review the ALJ's decision.  In their decision, the Appeals Council wrote that the supplemental evidence "[did] not provide a basis for changing the Administrative Law Judge's decision." (Tr. 2.)[3]  The Court agrees.  The Appeals Council need not consider additional evidence that does not relate to the period on or before the date of the hearing decision.  *See* 20 C.F.R. §404.970(b).  The evidence is not material if it is not "relevant to the claimant's condition during the time period for which benefits were denied." *Knight*, 2011 WL 4073603, at *12.  Therefore, the evidence

---

[3] In addition to the supplemental evidence, the Appeals Council noted that "since the date of the Administrative Law Judge's decision, [Plaintiff was] found to be under a disability beginning July 12, 2008 [the day after ALJ Rosenbaum's opinion was issued] based on the application(s) you filed on January 21, 2009; however, the Council found that this information [did] not warrant a change in the [ALJ's] decision." (Tr. 2.)  Plaintiff does not take issue with this aspect of the Appeals Council's determination and this Court does not have the record for that disability application, and therefore, the Court will not address it here.

here must be relevant to Plaintiff's health prior to July 11, 2008.  The first additional letter, from Dr. Odiel, indicates that this particular doctor first saw Plaintiff on July 28, 2008.  (Tr. 630.)  The second letter states that Plaintiff was under the care of the Pain Management Clinic at the Kings County Hospital since July 2009.  (Tr. 632.)  The final letter indicates that treatment with Dr. Allen began in January 2008.  (Tr. 633.)  However, Plaintiff did not report seeing Dr. Allen when asked about his physicians at the hearing and did not mention it when prompted for the information by his social security paperwork.  (*See* Tr. 37-38, 602.)  The Commissioner therefore contends that this date was provided in "error" and Plaintiff does not contest.  Regardless, it is clear that the first two pieces of additional evidence are from physicians who did not begin to see Plaintiff until after the unfavorable ALJ decision was issued.  Additionally, even if Dr. Allen's report refers to the accurate date, it does not provide a basis for changing the ALJ's decision because the decision still would not be contrary to the weight of the evidence overall.  Considering the record as a whole, during the relevant time period Plaintiff is regularly noted to be in no acute distress, his imaging studies and physical exams are consistently within normal limits, there is no evidence that his cancer has progressed, and there is no clear etiology for his alleged pain.  (*See ante* at 4-13.)  Plaintiff can take the bus, care for his young daughter, and handle his personal grooming.  (Tr. 42, 118-120; *ante* at 11-12.)  Further, the court notes that Plaintiff initially claimed to have stopped working because of pain beginning in November of 2006, but later testified that he stopped working because he was laid off.  (*See ante* at 2-3.) Dr. Allen choosing to refer Plaintiff to a pain management specialist and recommending that Plaintiff avoid "strenuous activities" does not shift the weight of the evidence such that the substantial evidence standard is not met.  This is especially true given that Plaintiff was already seeing Dr. Gulati for pain management and the ALJ's residual functional capacity determination

reflects a reduction for difficulty with heavy lifting.  After an exhaustive review of the record, the Court concludes that the ALJ did not err in his assessment of Plaintiff's credibility and residual functional capacity.  The Court is satisfied that the ALJ's determination was based on substantial evidence.  Further, the Appeals Council did not err in denying Plaintiff's request for review.  The weight of the entire record provides substantial evidence to support the conclusion that Plaintiff was not disabled on or before July 11, 2008, and accordingly, the Commissioner's decision is affirmed.

## III.    CONCLUSION

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and Plaintiff Mario Lopez's motion is denied.  The final decision of the Commissioner is affirmed.

**SO ORDERED.**

_____s/SLT_____
SANDRA L. TOWNES
United States District Judge

Dated:  September 10, 2012
        Brooklyn, New York

25